1 | **AMBER BAYLOR**
California Bar No. 248196
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California 92101-5008
Telephone: (619) 234-8467 ext. 3737/3723
4 |

5 | Attorneys for Mr. Martin

6 |

7 |

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE DANA M. SABRAW)**

11 | UNITED STATES OF AMERICA,       )   Criminal No. 07CR3406-DMS
                                    )
12 |              Plaintiff,         )   Date:  January 11, 2008
                                    )   Time:  11:00 a.m.
13 | v.                             )
                                    )   STATEMENT OF FACTS AND MEMORANDUM
14 | PETER MARTIN,                   )   OF POINTS AND AUTHORITIES
                                    )   IN SUPPORT OF DEFENDANT'S MOTIONS
15 |              Defendant.         )
                                    )
16 | ──────────────────────────       **I.**

17 | **STATEMENT OF FACTS**

18 |        The following statement of facts and facts further cited in this motion are based primarily on

19 | discovery received to date by the defense.   Defendant in no way admits the truth of these facts nor their

20 | accuracy as cited in these motions.  Further, Mr. Martin reserves the right to challenge the truth and accuracy

21 | of these facts in any subsequent pleadings or during any further proceedings.

22 |        Mr. Martin is accused of knowingly bringing undocumented people into the United States

23 | from Mexico.  Counts 7 and 8 allege that Mr. Martin brought in one undocumented individual without

24 | presentation and for financial gain.

25 |        On December 9, 2007, Mr. Martin allegedly entered the United States at the San Ysidro,

26 | California Port of Entry driving a silver Ford Focus.  A woman named Sandra Kole was present as a

27 | passenger in the vehicle.  At primary station, a Customs and Border Patrol Agent performed a name query

28 | on Ms. Kole.  He escorted Mr. Martin and Ms. Kole to the secondary lot.  There an agent searched the spare

07CR3406

1    tire well of the car.   Within the back of the vehicle, the agent found one individual.

2          Mr. Martin was subsequently arrested and interrogated by agents.   Mr. Martin made

3    statements, without a lawyer present, in response to the agents' questions.  On December 19, 2007, Mr.

4    Martin was indicted by the January 2007 grand jury.

5

6                                                    **II.**

7                    **MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**

8          Mr. Martin moves for the production of this and the following discovery.  This request is

9    not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that

10   is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies."

11   See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989). **Specifically, Mr. Martin requests that the**

12   **government preserve the vehicle he was allegedly driving until defense counsel has the**

13   **opportunity to view the car.  Mr. Martin requests the opportunity to view the car before it leaves**

14   **the government's custody.  He also requests arrest reports and notes for the co-defendant Sandra**

15   **Kole as Brady material.**

16          (1)  Arrest Reports and Notes.  The defendant also specifically requests that the

17   government turn over all arrest reports, notes and TECS records not already produced that relate to the

18   circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to, any

19   rough notes, records, reports, transcripts, referral slips, or other documents in which statements of the

20   defendant or any other discoverable material is contained.  Such material is discoverable under Fed. R.

21   Crim. P. 16(a)(1)(A) and Brady v. Maryland.  The government must produce arrest reports,

22   investigators' notes, memos from arresting officers, sworn statements, and prosecution reports pertaining

23   to the defendant.  See Fed. R. Crim. P. 16(a)(1)(B) and (E), 26.2 and 12(I); United States v.  Harris, 543

24   F.2d 1247, 1253 (9th Cir. 1976) (original notes with suspect or witness must be preserved); see also

25   United States v. Anderson, 813 F.2d 1450, 1458 (9th Cir. 1987) (reaffirming Harris' holding).

26          (2)  Brady Material.  The defendant requests all documents, statements, agents' reports,

27   and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility

28

1  of the government's case.  Kyles v. Whitley, 514 U.S. 419 (1995).  Under Brady, Kyles and their

2  progeny, impeachment as well as exculpatory evidence falls within the definition of evidence favorable

3  to the accused.  See also United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S.

4  97 (1976).  This includes information obtained from other investigations which exculpates Mr. Martin.

5  **He specifically requests arrest reports, investigators' notes, memos from arresting officers, sworn**

6  **statements, TECS hits and prosecution reports for Ms. Kole.**

7              (3)  Any Information That May Result in a Lower Sentence Under The Guidelines.  The

8  government must also produce this information under Brady v. Maryland.  This request includes any

9  cooperation or attempted cooperation by the defendant as well as any information, including that

10  obtained from other investigations or debriefings, that could affect any base offense level or specific

11  offense characteristic under Chapter Two of the Guidelines.  The defendant also requests any

12  information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history,

13  and information relevant to any other application of the Guidelines.

14              (4)  The Defendant's Prior Record.  The defendant requests disclosure of his prior record.

15  Fed. R. Crim. P. 16(a)(1)(D).

16              (5)  Any Proposed 404(b) Evidence.  The government must produce evidence of prior

17  similar acts under Fed. R. Crim. P. 16(a)(1)(E) and Fed. R. Evid. 404(b) and 609.  In addition, "upon

18  request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

19  general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial

20  and the purpose for which introduction is sought.  This applies not only to evidence which the

21  government may seek to introduce in its case-in-chief but also to evidence which the government may

22  use as rebuttal.  See United States v. Vega, 188 F.3d 1150 (9th Cir. 1999).  The defendant is entitled to

23  "reasonable notice" so as to "reduce surprise," preclude "trial by ambush" and prevent the "possibility of

24  prejudice."  Id.; United States v. Perez-Tosta, 36 F.3d 1552,  1560-61 (11th Cir. 1994).  Mr. Martin

25  requests such reasonable notice at least two weeks before trial so as to adequately investigate and

26  prepare for trial.

27              (6)  Evidence Seized.  The defendant requests production of evidence seized as a result

28

07CR3406

1  of any search, either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(E).

2          (7)  <u>Request for Preservation of Evidence</u>.  The defendant specifically requests the

3  preservation of any and all physical evidence that may be destroyed, lost, or otherwise put out of the

4  possession, custody, or care of the government and which relates to the arrest or the events leading to the

5  arrest in this case.  This request includes, but is not limited to, the narcotics evidence, the results of any

6  fingerprint analysis, the vehicle which the defendant drove, the defendant's personal effects, any effects

7  found within the vehicle, and any evidence seized from the defendant or any third party in relation to this

8  case.  **Specifically, Mr. Martin requests that the court order the government to preserve the vehicle**

9  **used in the alleged offense.**

10          In addition, Mr. Martin  requests that the Assistant United States Attorney assigned to this

11  case oversee a review of all personnel files of each agent involved in the present case for impeachment

12  material.  <u>Kyles</u>, 514 U.S. at 419; <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991); <u>United States</u>

13  <u>v. Lacy</u>, 896 F. Supp. 982 (N.D. Ca. 1995).  At a minimum, the prosecutor has the obligation to inquire

14  of his or his agents in order to ascertain whether or not evidence relevant to veracity or other

15  impeachment exists.

16          (8)  <u>Tangible Objects</u>.  The defendant requests the opportunity to weigh the narcotics, to

17  inspect and copy as well as test, if necessary, all other documents and tangible objects, including

18  photographs, books, papers, documents, fingerprint analyses, vehicles, or copies of portions thereof,

19  which are material to the defense or intended for use in the government's case-in-chief or were obtained

20  from or belong to the defendant.  Fed. R. Crim. P. 16(a)(1)(E).  Specifically, to the extent they were not

21  already produced, the defendant requests copies of all photographs in the government's possession of the

22  vehicle, the defendants, and any other photos taken in connection with this case.

23          (9)  <u>Expert Witnesses</u>.  The defendant requests the name, qualifications, and a written

24  summary of the testimony of any person that the government intends to call as an expert witness during

25  its case in chief.  Fed. R. Crim. P. 16(a)(1)(G).  The defense requests that notice of expert testimony be

26  provided at a minimum of two weeks prior to trial so that the defense can properly prepare to address

27  and respond to this testimony, including obtaining its own expert and/or investigating the opinions and

28

07CR3406

1  credentials of the government's expert.  The defense also requests a hearing in advance of trial to

2  determine the admissibility of qualifications of any expert.  See Kumho v.  Carmichael Tire Co. 119 S.

3  Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine reliability and relevancy of expert

4  testimony and such determinations may require "special briefing or other proceedings . . . .").

5        (10)  Evidence of Bias or Motive to Lie.  The defendant requests any evidence that any

6  prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify

7  or distort his or her testimony.

8        (11)  Impeachment Evidence.  The defendant requests any evidence that any prospective

9  government witness has engaged in any criminal act whether or not resulting in a conviction and whether

10  any witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613; Brady

11  v. Maryland.

12        (12)  Evidence of Criminal Investigation of Any Government Witness.  The defendant

13  requests any evidence that any prospective witness  is under investigation by federal, state or local

14  authorities for any criminal conduct.

15        (13)  Evidence  Affecting Perception, Recollection, Ability to Communicate, or Truth

16  Telling.  The defense requests any evidence, including any medical or psychiatric report or evaluation,

17  that tends to show that any prospective witness's ability to perceive, remember, communicate, or tell the

18  truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substance,

19  or has ever been an alcoholic.

20        (14)  Jencks Act Material.  The defendant requests production in advance of trial of all

21  material, including any tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C.

22  § 3500; Fed. R. Crim. P. 26.2.  Advance production will avoid the possibility of delay at the request of

23  the defendant to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute

24  an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement

25  under section 3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United

26  States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that where an agent goes over interview notes

27  with subject interview notes are  subject to Jencks Act).

28

07CR3406

1       (15)  Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), the

2    defendant requests all statements and/or promises, express or implied, made to any government

3    witnesses, in exchange for their testimony in this case, and all other information which could arguably be

4    used for the impeachment of any government witnesses.

5       (16)  Agreements Between the Government and Witnesses.  In this case, the defendant

6    requests identification of any cooperating witnesses who have committed crimes but were not charged so

7    that they may testify for the government in this case.  The defendant also requests discovery regarding

8    any express or implicit promise; understanding; offer of immunity; past, present, or future compensation;

9    or any other kind of agreement or understanding, including any implicit understanding relating to

10   criminal or civil income tax, forfeiture or fine liability between any prospective government witness and

11   the government (federal, state and/or local).  This request also includes any discussion with a potential

12   witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if

13   no bargain was made, or the advice not followed.

14      Pursuant to United States v. Sudikoff, 36 F. Supp.2d 1196 (C.D. Cal. 1999), the defense

15   requests all statements made, either personally or through counsel, at any time which relate to the

16   witnesses' statements regarding this case, any promises -- implied or express -- regarding

17   punishment/prosecution or detention of these witnesses, any agreement sought, bargained for or

18   requested, on the part of the witness at any time.

19      (17)  Informants and Cooperating Witnesses.  To the extent that there was any informant,

20   or any other tip leading to a TECS hit in this case the defendant requests disclosure of the names and

21   addresses of all informants or cooperating witnesses used or to be used in this case, and in particular,

22   disclosure of any informant who was a percipient witness in this case or otherwise participated in the

23   crime charged against Mr. Martin.  The government must disclose the informant's identity and location,

24   as well as the existence of any other percipient witness unknown or unknowable to the defense.  Roviaro

25   v. United States, 353 U.S. 53, 61-62 (1957).  The government must disclose any information derived

26   from informants which exculpates or tends to exculpate the defendant.

27      (18)  Bias by Informants or Cooperating Witnesses.  The defendant requests disclosure of

28

07CR3406

1  any information indicating bias on the part of any informant or cooperating witness.  <u>Giglio v. United</u>

2  <u>States</u>.  Such information would include what, if any, inducements, favors, payments or threats were

3  made to the witness to secure cooperation with the authorities.

4  (19)  <u>Residual Request</u>.  Mr. Martin intends by this discovery motion to invoke his rights

5  to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

6  Constitution and laws of the United States.  Mr. Martin requests that the government provide his

7  attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay

8  prior to cross-examination.

9

10  **III.**

11  **MOTION TO SUPPRESS STATEMENTS**

12  Mr. Martin  moves to suppress any and all statements made at the time of his arrest on the

13  grounds that his <u>Miranda </u>waiver was not knowing, intelligent, and voluntary.  Moreover, Mr. Martin

14  moves to suppress any other statements made on the grounds that those statements were not made

15  voluntarily.

16  **A.        The Government must demonstrate compliance with *Miranda*.**

17  In order for any statements made by Mr. Martin  to be admissible against him, the

18  government must demonstrate that they were obtained in compliance with the <u>Miranda</u> decision.

19  **1.  Mr. Martin's Waiver Must Be Voluntary, Knowing, and Intelligent.**

20  The question remains whether Mr. Martin's waiver was voluntary, knowing, and

21  intelligent. <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).  When interrogation continues without

22  the presence of an attorney, and a statement results, the government has a heavy burden to demonstrate

23  that the defendant has intelligently and voluntarily waived his privilege against self-incrimination.

24  <u>Miranda</u>, 384 U.S. at 475.   The court must indulge every reasonable presumption against waiver of

25  fundamental constitutional rights, so the burden on the government is great.  <u>United States v. Heldt</u>, 745

26  F. 2d 1275, 1277 (9th Cir. 1984).

27  In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to

28

07CR3406

1  the totality of the circumstances surrounding the case.  Edwards v. Arizona, 451 U.S. 477 (1981); United

2  States v. Garibay, 143 F.3d 534 (9th Cir. 1998).  The Ninth Circuit has held that determination of the

3  validity of a Miranda waiver requires a two prong analysis:  the waiver must be both (1) voluntary and

4  (2) knowing and intelligent.  Derrick v. Peterson, 924 F. 2d 813 (9th Cir. 1990).  The second prong

5  requires an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the

6  right being abandoned and the consequences of the decision to abandon it."  Id. at 820-821 (quoting

7  Colorado v. Spring, 479 U.S. 564, 573 (1987)).  Not only must the waiver be uncoerced, then, it must

8  also involve a "requisite level of comprehension" before a court may conclude that Miranda rights have

9  been legitimately waived.  Id.  (quoting Colorado v. Spring, 479 U.S. at 573).

10         Unless and until Miranda warnings and a knowing and intelligent waiver are

11  demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

12  against the defendant.  Miranda, 384 U.S. at 479.  The government in this case must prove that Mr.

13  Martin waived his rights intelligently and voluntarily.  Mr. Martin disputes any allegation that his waiver

14  was knowing, intelligent, and voluntarily.

15         **2.  Mr. Martin's Statements Must be Voluntary.**

16         Even if Mr. Martin's statements were made after a voluntary, knowing, and intelligent

17  waiver, they must have been made voluntarily, or they must be suppressed.   The Supreme Court has

18  held that even where the procedural safeguards of Miranda are satisfied, a defendant in a criminal case is

19  deprived of due process of law if his conviction is founded on involuntary statements.  Arizona v.

20  Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964); see also United States v.

21  Davidson, 768 F.2d 1266, 1269 (11th Cir. 1985)("an accused is deprived of due process if his conviction

22  rests wholly or partially upon an involuntary confession, even if the statement is true, and even if there is

23  ample independent evidence of guilt.").  The government has the burden of proving that statements are

24  voluntary by a preponderance of the evidence.  Lego v. Twomey, 404 U.S. 477, 483 (1972).  An

25  accused's confession must result from an "independent and informed choice of his own free will,

26  possessing the capability to do so, his will not being overborne by the pressures and circumstances

27  swirling around him."  Martin v. Wainwright, 770 F. 2d 918, 924 (11th Cir. 1985), modified, 781 F. 2d

28

185 (11th Cir.)  (quotations omitted).

To be considered voluntary, a statement must be the product of a rational intellect and a free will.  Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was overborne in a particular case, the court must consider the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).[1]  A confession is deemed involuntary not only if coerced by physical intimidation, but also if achieved through psychological pressure.  "The test is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'"  Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)); accord, United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

Here, Mr. Martin's statements were taken after his co-defendant, Ms. Kole, claimed that she was pregnant, in a medical crisis, and needed immediate attention.  The 21 year-old was aware that Ms. Kole was also questioned and was likely going to be subjected to arrest and prosecution.  Concern for the welfare of an individual stopped with the defendant can be a form of psychological coercion, especially if the defendant fears that not speaking could cause a delay.  See United States v. Tingle, 658 F.3d 1332 (9th Cir. 1981) (finding a confession involuntary because defendant had to speak to officers while the child who accompanied her was present in the station without any other adult); United States v. McShane, 462 F.2d 5 (9th Cir. 1972)(psychological coercion can result from the defendant's concern for the well-being for the individual with them),  Accordingly, suppression of Mr. Martin's statements may be required.

**B.**        **This Court Must Conduct an Evidentiary Hearing.**

Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Mr. Martin are voluntary.  In addition, section 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Martin understood the

[1]Among the factors which are considered are the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of questioning, and the use of physical punishment such as deprivation of food or sleep.

07CR3406

1  nature of the charges against him and whether he understood his rights. Without evidence, this Court

2  cannot adequately consider these statutorily mandated factors.

3        Moreover, section 3501(a) requires this Court to make a factual determination.  Where a

4  factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12.

5  See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "`suppression hearings

6  are often as important as the trial itself,'" Id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)),

7  these findings should be supported by evidence, not merely an unsubstantiated recitation of purported

8  evidence in a prosecutor's responsive pleading.

9

10                                    **III.**

11  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
   **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**
12  **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
   **AMENDMENT BY DEPRIVING MR. MARTIN OF THE TRADITIONAL FUNCTIONING OF**
13                           **THE GRAND JURY**

14  **A.        Introduction.**

15        The indictment in the instant case was returned by the January 2007 grand jury.  See CR

16  at 7.[2]  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court

17  Judge on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11,

18  2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand

19  jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury

20  instruction previously given in this district in several ways.[3]  These instructions compounded Judge

21  Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand

22  jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of

23

24

25        [2]  "CR" refers to the Clerk's Record in Case Number 07cr1905-H.

26
        [3]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-
27  Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United
   States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299
28  F.3d 1156 (9th Cir. 2002) (per curiam).

1  Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[4]

2      **1.  Judge Burns Instructed Grand Jurors That Their Singular**
        **Duty Is to Determine Whether or Not Probable Cause Exists**
3       **and That They Have No Right to Decline to Indict When the**
        **Probable Cause Standard Is Satisfied.**
4

5          After repeatedly emphasizing to the grand jurors that probable cause determination was

6  their sole responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were

7  forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not

8  there should be a federal law or should not be a federal law designating certain activity [as] criminal is

9  not up to you." See id. at 8.  The instructions go beyond that, however, and tell the grand jurors that,

10  should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm

11  going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in

12  favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars

13  the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

14          Immediately before limiting the grand jurors' powers in the way just described, Judge

15  Burns referred to an instance in the grand juror selection process in which he excused three potential

16  jurors.  See id. at 8.

17              I've gone over this with a couple of people.  You understood from the
                questions and answers that a couple of people were excused, I think three
18              in this case, because they could not adhere to the principle that I'm about to
                tell you.
19

20  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

21  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on

22  his view of their discretion; he enforced that view on pain of being excused from service as a grand

23  juror.

24          Examination of the recently disclosed voir dire transcript, which contains additional

25

26          [4]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role
    of the grand jury.  Mr. Martin requests that the video presentation be produced.  See United States v. Alter,
27  482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground
    rules by which the grand jury conducts those proceedings are not.").

28          [5]  See also id. at 20 ("You're all about probable cause.").

1  instructions and commentary in the form of the give and take between Judge Burns and various

2  prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine

3  whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of

4  the criminal laws enacted by Congress merely compounded an erroneous series of instructions already

5  given to the grand jury venire.  In one of his earliest substantive remarks, Judge Burns makes clear that

6  the grand jury's sole function is probable cause determination.

7          [T]he grand jury is determining really two factors: "do we have a
           reasonable belief that a crime was committed?  And second, do we have a
8          reasonable belief that the person that they propose that we indict
           committed the crime?"
9
           If the answer is "yes" to both of those, then the case should move forward.
10         If the answer to either of the questions is "no," then the grand jury should
           not hesitate and not indict.
11

12  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that

13  the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

14  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

15  committed" or if it has no "reasonable belief that the person that they propose that we indict committed

16  the crime."

17          Equally revealing are Judge Burns's interactions with two potential grand jurors who

18  indicated that, in some unknown set of circumstances, they might decline to indict even where there was

19  probable cause.  Because of the redactions of the grand jurors' names, Mr. Martin will refer to them by

20  occupation.  One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent

21  (hereinafter REA).  The CSW indicated a view that no drugs should be considered illegal and that some

22  drug prosecutions were not an effective use of resources.  See id. at 16.  The CSW was also troubled by

23  certain unspecified immigration cases.  See id.

24          Judge Burns made no effort to determine what sorts of drug and immigration cases

25  troubled the CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases

26  actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation

27  and alien smuggling.  Rather, he provided instructions suggesting that, in any event, any scruples CSW

28

07CR3406

may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell me that.

 See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.  We want you to make a business-like decision of whether there was a probable cause. . . .

07CR3406

<u>Id.</u> at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. <u>See id.</u> at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." <u>See id.</u> That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."

> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

<u>Id.</u> at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

<u>Id.</u> at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization – whether he or she would indict "depend[s] on the case," <u>see id.</u>, as it should. Because REA's vote "depend[s] on the case," <u>see id.</u>, it is necessarily true that REA would

07CR3406

1  vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause.

2  Again, Judge Burns made no effort to explore REA's views; he did not ascertain what sorts of cases

3  would prompt REA to hesitate.  The message is clear: it does not matter what type of case might prompt

4  REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor

5  of the case going forward."[6]  See id. at 27.  That is why even the "chance," see id., that a grand juror

6  might not vote to indict was too great a risk to run.

7        **2. The Instructions Posit a Non-Existent Prosecutorial Duty to**
           **Offer Exculpatory Evidence.**

8

9        In addition to his instructions on the authority to choose not to indict, Judge Burns also

10  assured the grand jurors that prosecutors would present to them evidence that tended to undercut

11  probable cause.  See Ex. A at 20.[7]

12

13  _____

    [6] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge
14  will have determined the existence of probable cause "in most circumstances" before it has been presented
    with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each
15  case because had a magistrate judge not so found, the case likely would not have been presented to the Grand
    Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court
16  "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective
    of the evidence presented.

17     [7] These instructions were provided in the midst of several comments that praised the United States
    attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that
18  the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in
    good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go
19  even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney,
    whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's
20  view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you
    are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a
21  presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business
    of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't
22  substantiate the charges against.").
       Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the
23  error inherent in his praising of the government attorneys.  See Ex. A at 9-10.  Judge Burns's instructions
    implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the
24  government attorneys to act inappropriately or to present cases for indictment where no probable cause
    existed.
25     In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses,
    Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there
26  is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the
    dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction,
27  which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that
    his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand
28  jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.      *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

---

jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

[8] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

07CR3406

1    For instance, with respect to the grand jury's relationship with the prosecution, the

2    Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public

3    prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs

4    much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v.

5    Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th

6    Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is

7    most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins,

8    J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any indictment or

9    presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a

10    presentment or to return an indictment drafted by the prosecutor."  Id.  See Niki Kuckes, The Democratic

11    Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302

12    (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand

13    jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of

14    Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

15    Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the

16    attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

17    The grand jury thus determines not only whether probable cause exists, but
      also whether to "charge a greater offense or a lesser offense; numerous
18    counts or a single count; and perhaps most significant of all, a capital
      offense or a non-capital offense – all on the basis of the same facts.  And,
19    significantly, the grand jury may refuse to return an indictment even
      "'where a conviction can be obtained.'"

20    Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description

21    of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

22    "controls not only the initial decision to indict, but also significant questions such as how many counts to

23    charge and whether to charge a greater or lesser offense, including the important decision whether to

24    charge a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the

25    Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury

26    has the power to refuse to indict someone even when the prosecutor has established probable cause that

27    this individual has committed a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-

28

1  Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73

2  (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict

3  enjoys strong support in the Ninth Circuit.  But not in Judge Burns's instructions.

4  **C.        Judge Burns's Instructions Forbid the Exercise of Grand Jury
            Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

5

6           The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for

7  the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its

8  previous decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors

9  indict upon every finding of probable cause because the term "should" may mean "what is probable or

10 expected."  299 F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in

11 context, as Judge Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J.,

12 dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an

13 inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional

14 independence.").  See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting

15 The Oxford American Diction and Language Guide 1579 (1999) (brackets in original)).

16          The debate about what the word "should" means is irrelevant here; the instructions here

17 make no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors

18 simply may not choose not to indict in the event of what appears to them to be an unfair application of

19 the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well,

20 I'm going to vote against indicting even though I think that the evidence is sufficient'...."  See Ex. A at 8-

21 9.  Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a

22 proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or

23 her to assess "the need to indict."  Vasquez, 474 U.S. at 264.

24          While Judge Burns used the word "should" instead of "shall" during voir dire with respect

25 to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear

26 that he could only mean "should" in the obligatory sense.  For example, when addressing a prospective

27 juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told

28

them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8.

At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the

purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See

Navarro-Vargas, 408 F.3d at 1205.  Clearly he was not.

The full passage cited above effectively eliminates any possibility that Judge Burns

intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially

states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have

intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See

Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the

grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338,

343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is

probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation

omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is

probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable

cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have

to have intended two different meanings of the word "should" in the space of two consecutive sentences.

That could not have been his intent.  But even if it were, no grand jury could ever have had that

understanding.[9]  Jurors are not presumed to be capable of sorting through internally contradictory

---

[9] This argument does not turn on Mr. Martin's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-

07CR3406

instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two

instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation,

internal quotations and brackets omitted).

　　　　　　Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made

it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

　　　　　　**(1)**  The first occasion occurred in the following exchange when Judge Burns conducted

voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward.
> I wouldn't want you to say, "Well, yeah, there's probable cause.  But I still
> don't like what the government is doing.  I disagree with these laws, so I'm
> not going to vote for it to go forward."  If that's your frame of mind, then
> probably you shouldn't serve.  Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if
> you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a

prospective juror.  Even if the prospective juror did not like what the government was doing in a

particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that

might prevent that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction for the

possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's

discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

　　　　　　**(2)** In an even more explicit example of what "should" meant, Judge Burns makes clear

that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other

prerogative.

> Court　　　. . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."
>
> You'd have a similar *obligation* as a grand juror even though you might
> have to grit your teeth on some cases.  Philosophically, if you were a
> member of Congress, you'd vote against, for example, criminalizing
> marijuana.  I don't know if that's it, but you'd vote against criminalizing

_____

Vargas/Marcucci reading as a possibility.

1   some drugs.

2   That's not what your *prerogative* is here.  Your prerogative instead is act
    like a judge and to say, "All right.  This is what I've got to deal with
3   objectively.  Does it seem to me that a crime was committed?  Yes.  Does
    it seem to me that this person's involved? It does."  *And then your*
4   *obligation, if you find those things to be true, would be to vote in favor of*
    *the case going forward*.
5

6   Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and

7   prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases

8   even though you were convinced there was probable cause they committed a drug offense?" Id. at 27.

9   The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.

10  Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall";

11  it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable

12  cause.

13          Moreover, as this example demonstrates, the issue is not limited to whether the grand jury

14  believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on

15  the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a

16  juror could not indict on probable cause for *every* case, then that juror was not fit for service.  It is

17  equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to

18  indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue the question of what

19  factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to

20  indict.

21

22          **(3)**  As if the preceding examples were not enough, Judge Burns continued to pound the

23  point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have

24  to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the

25  federal laws here."  See id. at 61.

26          **(4)**  And then again, after swearing in all the grand jurors who had already agreed to indict

27  in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when

28

07CR3406

1  he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I

2  think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal

3  definition of what the law ought to be and try to impose that through applying it in a grand jury setting."

4  See Ex. A at 9.

5           Moreover, Judge Burns advised the grand jurors that the were forbidden from considering

6  the penalties to which indicted persons may be subject.

7           Prospective Juror (REA): ... And as far as being fair, it kind of depends on
            what the case is about because there is a disparity between state and
8           federal law.
            The Court:  In what regard?
9           Prospective Juror: Specifically, medical marijuana.
            The Court:  Well, those things – the consequences of your determination
10          shouldn't concern you in the sense that penalties or punishment, things like
            that – *we tell trial jurors, of course, that they cannot consider the*
11          *punishment or the consequence that Congress has set for these things.*
            *We'd ask you to also abide by that.*  We want you to make a business-like
12          decision of whether there was a probable cause. ...

13  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

14  would obviously leave no role for the consideration of penalty information.

15           The Ninth Circuit previously rejected a claim based upon the proscription against

16  consideration of penalty information based upon the same unlikely reading of the word "should"

17  employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).

18  Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the

19  passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning in

20  employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The

21  instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See

22  474 U.S. at 263.

23           Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time

24  and time again that they had a duty, an obligation, and a singular prerogative to indict each and every

25  case where there was probable cause.  These instructions go far beyond the holding of Navarro-Vargas

26  and stand in direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity

27  to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what

28

07CR3406

the Supreme Court held in <u>Vasquez</u>:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

 474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u> <u>id.</u> at 264.  Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury.  The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be dismissed.  <u>Id.</u>

The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses.  The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent."  <u>Id.</u> at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting).  The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." <u>Id.</u>  After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" <u>Id.</u> (quoting <u>Richardson v.</u>

07CR3406

1   <u>Marsh</u>, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand

2   jurors could not possibly fulfill the role described in <u>Vasquez</u>. Indeed, "there is something supremely

3   cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if

4   they disobey them." <u>Id.</u>

5           In setting forth Judge Hawkins' views, Mr. Martin understands that this Court may not

6   adopt them solely because the reasoning that supports them is so much more persuasive than the

7   majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable

8   reasoning.

9           Here, again, the question is not an obscure interpretation of the word "should", especially

10  in light of the instructions and commentary by Judge Burns during voir dire discussed above -

11  unaccounted for by the Court in <u>Navarro-Vargas II</u> because they had not yet been disclosed to the

12  defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of

13  that right in <u>Vasquez</u>, <u>Campbell</u>, and both <u>Navarro-Vargas II</u> opinions. <u>Navarro-Vargas II</u> is

14  distinguishable on that basis, but not only that.

15          Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u>

16  plainly states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth

17  Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that]

18  principle...." <u>See</u> Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its

19  deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their

20  willingness to act as the conscience of the community. <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11

21  (Hawkins, J., dissenting) (a grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the

22  accused from the other branches of government by acting as the 'conscience of the community.'")

23  (quoting <u>Gaither v. United States</u>, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts

24  possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure,"

25  <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own

26  rules and enforced them.

27

28

1

**D.**     **The Instructions Conflict with <u>Williams</u>' Holding That There Is No
Duty to Present Exculpatory Evidence to the Grand Jury.**

2

3          In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth

4  Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors

5  to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth

6  Amendment common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no

7  such 'supervisory' judicial authority exists."  <u>See id.</u> at 47.  Indeed, although the supervisory power may

8  provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least

9  where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully

10  drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'"

11  <u>id.</u> at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial

12  conduct in the first instance."  <u>Id.</u> at 47 (emphasis added).  The federal courts possess only "very limited"

13  power "to fashion, on their own initiative, rules of grand jury procedure."  <u>Id.</u> at 50.  As a consequence,

14  <u>Williams</u> rejected the defendant's claim, both as an exercise of supervisory power and as Fifth

15  Amendment common law.  <u>See id.</u> at 51-55.

16          Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that

17  prosecutors would present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

18                    Now, again, this emphasizes the difference between the function of the
                    grand jury and the trial jury. You're all about probable cause. If you think
19                    that there's evidence out there that might cause you say "well, I don't think
                    probable cause exists," then it's incumbent upon you to hear that evidence
20                    as well. As I told you, in most instances, *the U.S. Attorneys are duty-
                    bound to present evidence that cuts against what they may be asking you
21                    to do if they're aware of that evidence.*

22
23   <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and

24  their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in

25  from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to

26  you."  <u>See id.</u> at 27.  The Ninth Circuit has already concluded it is likely this final comment is

27  "unnecessary."  <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

28          This particular instruction has a devastating effect on the grand jury's protective powers,

07CR3406

particularly if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow

concluded was not conveyed by the previous instruction: "You're all about probable cause."  <u>See</u> Ex. A

at 20.  Thus, once again, the grand jury is reminded that they are limited to probable cause

determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had

already told the grand jurors that they likely would be excused if they rejected this limitation).  The

instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable

cause, but also advises the grand jurors that the prosecutor will present it.  The end result, then, is that

grand jurors should consider evidence that goes against probable cause, but, if none is presented by the

government, they can  presume that there is none.  After all, "in most instances, the U.S. Attorneys are

duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of

that evidence."  <u>See id.</u>  Moreover, during voir dire, Judge Burns informed the jurors that "my experience

is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against the

charge, you'll be informed of that.  *They have a duty to do that*."  <u>See</u> Ex. B at 14-15 (emphasis added).

Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound"

prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of

[them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."

<u>See</u> Ex. A at 27.

          These instructions create a presumption that, in cases where the prosecutor does not

present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in

which no exculpatory evidence was presented, would proceed along these lines:

          (1) I have to consider evidence that undercuts probable cause.

          (2)  The candid, honest, duty-bound prosecutor would, in good faith, have presented any

          such evidence to me, if it existed.

          (3)  Because no such evidence was presented to me, I may conclude that there is none.

 Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

evidence presented represents the universe of all available exculpatory evidence; if there was more, the

07CR3406

duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation – if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time – and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.


**IV.**

**<u>REQUEST FOR LEAVE TO FILE FURTHER MOTIONS</u>**

As new information arises from further discovery, defense counsel for Mr. Martin may find it necessary to file further motions, specifically a motion to sever, or to supplement existing motions with additional facts.  Therefore, defense counsel requests the opportunity to file further motions based upon information gained from discovery.


**V.**

**<u>CONCLUSION</u>**

For the reasons stated above, Mr. Martin moves this Court to grant his motions.


Respectfully submitted,

Dated:  January 11, 2008

_/s/ Amber Baylor_
**AMBER BAYLOR**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Peter Michael Martin